*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2013-382

FEBRUARY TERM, 2014

| | |
|---|---|
| In re A.W. and A.W., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Orleans Unit, |
| | } Family Division |
| | } |
| | } DOCKET NOS. 29/30-4-11 Osjv |

Trial Judge: M. Kathleen Manley

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights with respect to his two daughters, Am.W. and Al.W. We affirm.

Father does not challenge the lion's share of the findings made by the superior court, family division. The unchallenged findings reveal the following facts. Am.W. and Al.W. were born in July 2008 and September 2010, respectively. Two weeks after Al.W.'s birth, father, who had been living with the mother and Am.W. for the previous two years, was incarcerated in New York on drug and firearms charges. The mother was the primary caregiver during those two years. Both parents were abusing controlled substances, including heroin. In April 2011, the children were taken into state custody on an emergency basis due to unexplained bruising and lacerations on the head, face, gums, and legs of Al.W. Both the mother and her new companion were substantiated for physical abuse, and the children were found to be children in need of care or supervision (CHINS) and placed with a foster family, with whom they still live.

In July 2011, Am.W. told her foster family that her paternal grandfather had "touched" her vagina in a manner that caused pain and bleeding. The Department for Children and Families (DCF) substantiated abuse by the grandfather, but the Human Services Board eventually overturned that substantiation. Shortly after Am.W.'s disclosure of sexual abuse, a medical examination revealed physical evidence of the abuse. The court credited the examiner's testimony that there was "a high likelihood of sexual assault," but could not make a definitive finding on the identity of the perpetrator.

Meanwhile, a disposition hearing that had commenced in July 2011 was continued to September 2011, by which time father had been released from prison based on a plea agreement. DCF's original disposition plan called for concurrent goals of reunification with the mother or adoption, but by the second day of the disposition hearing DCF was advocating for termination of parental rights. Father, however, requested an opportunity to reunite with the children, and DCF developed a new case plan that included reunification with him. In November 2011, the court approved the new plan, which required father to: (1) refrain from drug use, participate in a substance-abuse assessment, follow treatment recommendations, and sign all release forms to allow DCF to monitor his progress; (2) participate in a mental health assessment, obtain mental

health counseling to help him process the abuse endured by the children and to understand how his own conduct had affected the children's lives, and sign all releases regarding his treatment; (3) visit the children regularly, meet with service providers to gain a better understanding of how to ease himself into the children's lives, and develop and maintain a healthy attachment with his children. Because of the children's young ages and the fact that they had already been in DCF custody for over six months, the plan anticipated father needing to achieve these goals within the next several months.

Things went relatively well at first. Father visited the children regularly, and his supervised contact increased from one hour a week to two-to-three hours twice a week. He met with the family time coach, the foster parents, and a DCF social worker at monthly shared parenting meetings. He was living with his father at the time, however, which was an impediment to his having unsupervised visitation with his daughters at his home. Moreover, as his contacts with the children increased, Am.W. became more distressed, resisted going to the visits, had tantrums, and engaged in self-harming behaviors. Father had problems handling both children at the same time, and persisted in arguing with Am.W. about her allegations that his father had sexually abused her, even after service providers advised him to acknowledge her statements and assure her that she was safe rather than to question the truth of what she was saying. He focused more on his distress about the way Am.W was treating him than he did on trying to understand what was happening.

In April 2012, father got his own apartment, and unsupervised visitation began, with the restriction that no one was to be in the apartment with father when the girls were visiting. Shortly after the unsupervised visits started, however, Am.W.'s anxieties increased, resulting in tantrums and vomiting before the contact began, nightmares, behavioral problems in school, and her retreating into a fantasy world. The visits were terminated in May 2012 after Am.W. reported that father had slapped Al.W. and that a man without a shirt on had been in the apartment. Father denied the accusations, and the court made no finding on whether the incidents actually occurred. Nonetheless, the court found that whatever happened during the three weeks of unsupervised visitation, it had created heightened anxieties for both children, to the extent that it negatively impacted their emotional and physical health.

Contacts between father and the children in the community began again in June 2012. Both children resisted the contact, with Al.W screaming and crying that she did not want to get out of the car, and Am.W. acting angry and telling father that she did not want to be there. Father continued to struggle with how to interact with the children, and upset them by telling them that the foster parents were not their parents. During these visits, the children turned to the family time coach for reassurance and soothing.

Throughout 2012 and 2013, Am.W. repeatedly talked about the sexual abuse and needed constant assurances that she was safe in various settings. Due to the level of Am.W.'s anxieties, DCF arranged for an evaluation to assess those anxieties and develop a plan to address them. The resulting assessment confirmed the observations of others that Am.W. had ongoing chronic trauma associated with a chaotic living environment, parental substance abuse, domestic abuse, and physical and sexual abuse, resulting in high anxiety levels, interrupted sleep patterns, dissociative fantasies, vomiting, and self-harming behaviors. The court found that Am.W.'s trauma required specialized parenting skills that would provide structure in her life. When the assessment was completed, father declined to review it with the family time coach and DCF social worker.

2

In October 2012, DCF filed petitions to terminate father's and the mother's parental rights. The termination hearing was held over four days in the spring of 2013. Based on the findings detailed above, the court terminated the parents' residual parental rights. With regard to father, the court concluded that there had been a substantial change of circumstances due to stagnation in his ability to parent the children and that the children's best interests required termination of parental rights. The court noted that because Am.W. and Al.W. were only thirty-three and seven months old, respectively, when they were taken into state custody, and because father was incarcerated for the first six months after their transfer to state custody, father understood that it was imperative for him make immediate and steady progress toward reunification.

Nevertheless, as the court found, father did not meet the case plan goals set forth in the November 2011 disposition order. Although father had consistent contact with the children, he did not engage in the services necessary for him to provide the children with the care they needed. He met with a substance-abuse counselor but failed to provide DCF with a copy of any assessment that was done or to execute waivers necessary for DCF to obtain an assessment or urine analysis that may have been done. He stopped substance abuse counseling in the summer of 2012 because he did not believe that he needed to attend any longer. Similarly, although father was referred for a mental health assessment to help him process the abuse that his children suffered, he met with a counselor for only a short period of time before he quit without providing DCF with any assessment. As for the goal that he develop a healthy bond with the children, father consistently visited them and participated in some shared parenting meetings, but he did not engage with a parent educator and he declined to continue with a special program aimed at helping parents care for children who had suffered trauma. Father informed service providers that the program caused him too much discomfort because it triggered memories of his own childhood trauma.

The court concluded that termination was in the children's best interests because the children needed stability and permanence after having suffered significant trauma at an early age. Particularly with respect to Am.W., the court credited the testimony of her counselor that she would be devastated if she were to be removed from her foster family, with whom she and her sister had spent most of their young lives. The court concluded that while father expressed a desire to continue to work toward obtaining the parenting skills necessary to address the children's significant needs, the children had spent a significant amount of their lives in foster care and could not wait any longer for father to obtain those necessary skills. According to the court, father was more focused on how his children behaved towards him and how his efforts towards reunification were being sabotaged by others rather than on how he could develop a healthy relationship with the children, who had been subjected to a chaotic early childhood. Thus, the court concluded that there was little likelihood that father could obtain the necessary parenting skills within a reasonable period of time, considering that the children had already been in state custody for twenty months while father made little progress towards putting himself in a position to parent them.

On appeal, father argues that the superior court erred by failing to acknowledge that DCF was substantially responsible for the circumstances that made it impossible for him to reunite with his children. According to father, DCF intentionally hampered service providers and, by doing so, obstructed the development of a healthy bond between him and his children. In support of this argument, father quotes testimony from Am.W.'s counselor and the therapist hired by DCF to do an assessment of Am.W. First, father quotes his trial attorney's cross-

examination of Am.W's counselor regarding a letter in which the counselor stated to Am.W.'s DCF caseworker his belief that father "and his support system could offer a childhood fostering the girls healing process, but they need additional help." When father's attorney asked the counselor whether DCF followed up on this recommendation, the counselor responded that he thought "there had been some changes in [the DCF caseworker's] feelings about safety due to observations about parenting." Second, father quotes the counselor answering that "it was at the recommendation of DCF" upon being asked why there had been only one joint counseling session with Am.W. and father. Third, father cites testimony by the therapist hired who assessed Am.W. acknowledging that he relied upon DCF's version of the child's history, that DCF had the authority to determine with whom he spoke, that he did not speak to father or the mother, and that it was generally better to speak to as many people as possible.

Upon review of the record, we do not agree that the trial court erred in failing to find that DCF sabotaged father's ability to develop a stronger bond with his children by participating in their counseling sessions. Am.W.'s counselor testified that during the one joint session he had with Am.W. and father approximately four weeks after he began counseling her in April 2012 she "was very, very clear through her play that she was not safe." The counselor explained that, during the joint session with father, Am.W. made no physical or eye contact with father and that her "play was focused on lack of safety" and "extreme themes of violence." When asked why he had only one joint session with father, he explained that "I was very cautious about jumping—having [father] in with her therapy; and in talking to [the DCF case worker], she offered that it wasn't a good idea right then." He stated that his door was always open to father, but that father never contacted him. When father's attorney pressed the counselor on cross-examination about why there was only a single joint counseling session with Am.W. and father, the counselor stated that "I think it was clinically unsafe for her at that time." He explained that "we were just starting a relationship and bringing what looked like a trigger to her trauma into our safety zone" so it "was probably something to take really, really slowly." He stated that eventually more joint sessions could have happened but that Am.W.'s reactions to father were not improving and so "there wasn't much to work on . . . to plant as a seed for [Am.W.] to feel comfortable." When father's attorney asked whether the lack of a relationship with father was "because dad wasn't allowed to be at the trauma visits," the counselor disagreed, stating that it was "because this little girl is hurt, and she's not ready or safe." When the attorney asked the counselor what someone in father's position could have done, the counselor responded that father had support from the family time coaches and other sources, including himself. The testimony of Am.W.'s counselor, taken in its entirety, does not compel the finding and conclusion urged by father.

For his part, the therapist hired by DCF to do the assessment of Am.W. stated that his job was to determine what impact Am.W.'s trauma from her earlier experiences was having on her and what components of caregiving and treatment were necessary to help her recover from that trauma. He stated on cross-examination that in making an assessment he generally valued the input of as many people as possible, but that he trusted DCF's judgment on whom to interview because he was usually unaware of where each case stood in the legal process. Father suggests that it was improper for the therapist conducting the assessment to rely on DCF's "version" of Am.W.'s history, but he does not point to any part of that history that was inaccurate or misleading to the therapist, and does not provide any support for the inference that if the therapist had talked to father, his conclusions and recommendations would have been different. Even if the therapist's failure to talk to father impacted the weight of the therapist's testimony, it would not render the therapist's testimony incompetent.

4

In short, the record supports the superior court's conclusion that there is little if any likelihood that father will be able to provide them the parental support they need in light of their chaotic early childhood. The record reflects that DCF offered and provided considerable services to father, that father's incarceration kept him from his children for six months early in their young lives, and that father was ultimately unable to take full advantage of the services provided by DCF to help him deal with his children's trauma and to develop a healthy relationship with them within a reasonable period, viewed from their perspective. Given this record, the trial court did not err in concluding that the lack of bond between father and children resulted from father's own conduct rather than from the conduct of DCF. We find no basis in the record to disturb the superior court's conclusion that termination of father's parental rights was in the best interests of the children. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) (stating that Supreme Court's role on appeal "is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights").

Affirmed.

BY THE COURT:


_____
John A. Dooley, Associate Justice


_____
Beth Robinson, Associate Justice


_____
Geoffrey W. Crawford, Associate Justice